IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | CASE NO. BK03-82793 |
| JEFFREY L. MILLER, ) | A06-8118-TJM |
| ) | |
| Debtor. ) | CH. 7 |
| NEBRASKA FURNITURE MART, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| JEFFREY L. MILLER, ) | |
| ) | |
| Defendant. ) | |

ORDER

Trial was held in this matter in Omaha, Nebraska, on March 3, 2008, regarding the complaint, Filing No. 1, filed herein. Sara Miller appeared for Nebraska Furniture Mart, Inc., and no appearance was made by or on behalf of Jeffrey L. Miller.

BACKGROUND

The debtor, Jeffrey L. Miller, was, prior to the bankruptcy filing in September of 2003, involved in a number of businesses. He owned franchise operations in Omaha, Nebraska, Kansas City and Las Vegas. The business of these franchises was to recruit executives for businesses throughout the country. His other business operation included ownership and management of residential apartment buildings and commercial office buildings. Over the years he was well-paid from the franchise operations, including a salary of approximately $500,000. He also received revenues from the net cash flow of the real estate venture.

In January of 2002, Mr. Miller got married and purchased a new home. To furnish the new home, he made purchases on credit from Nebraska Furniture Mart. Those purchases were made in February, March, May and June of 2002.

Mr. Miller had a separate account at Nebraska Furniture Mart under the name of Miller Management which he used to purchase carpet and other things used in his real estate management business. In the spring and early summer of 2003, he made purchases under the Miller Management account of carpet and a projector.

In September of 2003, he filed a Chapter 11 case which was eventually converted to Chapter 7. Nebraska Furniture Mart has filed this adversary proceeding alleging that he entered into the credit transactions in 2002 and 2003 when he actually knew that he would be unable to make the payments on the credit purchases and that the debt representing those purchases should be determined to be non-dischargeable under 11 U.S.C. § 523(a)(2)(A) as based upon false pretenses, a false representation, or actual fraud. In addition, the Nebraska Furniture Mart pled in its complaint that the debt should be held non-dischargeable under 11 U.S.C. § 523(a)(6) for willful and malicious injury by the debtor to Nebraska Furniture Mart.

Trial was held on March 3, 2008. The evidence presented on behalf of Nebraska Furniture Mart in support of its position does not relate to 11 U.S.C. § 523(a)(6) and therefore that statutory provision shall not be dealt with in this order.

LAW

Section 523(a)(2)(A) provides an exception from discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

"Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." Merchants Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999) (quoting RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995)). "A 'false pretense' involves implied misrepresentation or conduct intended to create and foster a false impression." Moen at 791 (quoting In re Guy, 101 B.R. 961, 978 (Bankr. N.D. Ind. 1988)). "[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." Moen at 791 (quoting In re Malcolm, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)).

To establish fraud within the context of § 523(a)(2)(A), the creditor must show, by a preponderance of the evidence, that: (1) the debtor made a representation; (2) the representation was made at a time when the debtor knew the representation was false; (3) the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained a loss as the proximate result of the representation having been made. Universal Bank, N.A. v. Grause (In re Grause), 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000) (citing Thul v. Ophaug (In re Ophaug), 827 F.2d 340, 342 n.1 (8th Cir. 1987), as supplemented by Field v. Mans, 516 U.S. 59 (1995)); Blue Skies, Inc. v. Preece (In re Preece), 367 B.R. 647, 652 (B.A.P. 8th Cir. 2007). In Field v. Mans, the Supreme Court held that § 523(a)(2)(A) requires justifiable reliance, in which "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id. at 71 (citing the Restatement (Second) of Torts § 545A cmt. b (1976)).

The focus of a § 523(a)(2)(A) determination is whether the debtor ever intended to pay the obligation. Gadtke v. Bren (In re Bren), 284 B.R. 681, 690 (Bankr. D. Minn. 2002).

To amount to fraud, a statement must be made deliberately and intentionally with the intention and purpose of deceiving. Lindau v. Nelson (In re Nelson), 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006). When assessing the debtor's knowledge that the representation was false, the court must consider the debtor's knowledge and experience. Moen, 238 B.R. at 791 (citing In re Duggan, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)). The knowledge requirement can be satisfied with a finding that the debtor recklessly disregarded the truth by making the false representation under circumstances where he should have known it to be false. Id.

"The intent element of § 523(a)(2)(A) does not require a finding of malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question." <u>Moen</u>, 238 B.R. at 791 (quoting <u>Moodie-Yannotti v. Swan (In re Swan)</u>, 156 B.R. 618, 623 n.6 (Bankr. D. Minn. 1993)). "Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." <u>Id.</u> (quoting <u>Caspers v. Van Horne (In re Van Horne)</u>, 823 F.2d 1285, 1287 (8th Cir. 1987)). The intent to deceive will be inferred when the debtor makes a false representation and knows or should know that the statement will induce another to act. <u>Id</u>. (quoting <u>Federal Trade Comm'n v. Duggan (In re Duggan)</u>, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)).

<u>FINDINGS OF FACT AND DISCUSSION</u>

Mr. Miller testified in a deposition, Filing No. 26, that some of his financial distress started during the recession in 2000 and 2001. His franchise businesses were dependent upon employers needing to hire employees and then, in turn, contracting with him to find the employees. The recession impacted that business. He also testified that in the months after the attacks on September 11, 2001, occurred, the franchise businesses started to have reductions in revenue production because his client employers slowed their hiring. In addition, he had a number of rental units that were vacant and for which he was investing cash to repair and re-rent.

In January of 2002, his franchise business still had significant cash flow based upon accounts receivable from the last quarter of 2001. He realized in the first quarter of 2002 that business was down quite a bit, but believed that the situation simply reflected his normal business cycle and that swings in revenue from one quarter to another of up to 25% were not unusual.

As of December of 2001, he owned a home in the Omaha area, a home in Las Vegas, Nevada, and a home in the Ozarks. He was making mortgage payments on each of them and they were current. In January of 2002, when he married, he purchased a new home in The Ridges area of Omaha, Nebraska, and planned to sell his other home in Omaha. It turned out that the planned sale of his home did not occur and so, during 2002 and part of 2003, he was making at least four mortgage payments, and though financially pressed, he had sufficient revenue from his businesses to make the payments.

In 2000 and 2001, his franchise business suffered an embezzlement. His bookkeeper, rather than depositing employee payroll taxes with the Internal Revenue Service, stole hundreds of thousands of dollars. Although she was eventually caught and sentenced to prison, the embezzlement and failure to pay the payroll taxes caused the Internal Revenue Service to make a large financial claim against him. By the time of the bankruptcy filing in 2003, he had paid the Internal Revenue Service debt down by approximately $200,000. Doing that, however, and keeping other obligations current caused him to fail to make all of the royalty payments required by his franchisor and so he, in 2003, was sued by the franchisor.

In July or August of 2003, Wells Fargo Bank began a foreclosure against one of his properties that had nine town homes. He believed the property had equity of a half million dollars, but the cash flow was not sufficient to convince the bank not to proceed with the foreclosure action. When it became clear that he was going to be sued by Wells Fargo Bank and the property foreclosed, he filed a Chapter 11 case.

He made some payments on the furniture bill which was incurred in 2002, but did not make any payments on the Miller Management account debt that was incurred in the spring and summer of 2003.

The total obligation, including principal and interest as of the petition date was $16,845.11. The majority, approximately $12,000, represented the furniture purchases in 2002.

The purchases of furniture for the home and carpet for the real estate business were not unusual or out of the ordinary. Mr. Miller had had accounts with the Nebraska Furniture Mart for many years. He had purchased furniture and other materials for his Las Vegas home and apparently had paid for those in a satisfactory manner. He had purchased furniture, carpet, appliances and air conditioners for his rental properties over the years and had apparently paid for those on a timely basis.

In early 2002 when he made the purchases for the home at The Ridges, he had just been married, just purchased a new home, and planned to live in that home and sell his prior home. His income, though lower than in previous years, was still sufficient to allow him to make regular payments on his mortgage obligations and other debt obligations. Nebraska Furniture Mart presented portions of Mr. Miller's tax returns for several years, which reflected business operating losses and income declines. However, since not all of the schedules which are part of both the U.S. and Nebraska returns were submitted, it cannot be determined what type of losses accounted for the decline in taxable income.

At the time of the 2003 purchases, within a few months of the bankruptcy filing, his real estate business was still operating at a break-even level. Although the franchise businesses were liquidated shortly after the bankruptcy petition was filed, apparently as a result of provisions in the franchise agreements, the real estate business continued to operate at some level until the case was converted to Chapter 7 in July of 2006.

As noted above, in order for a creditor to be successful in a non-dischargeability action brought under 11 U.S.C. § 523(a)(2)(A), the creditor must show, by a preponderance of evidence, that the debtor made a representation, it was made at a time when the debtor knew the representation was false, it was made deliberately and intentionally with the intent and purpose of deceiving the creditor, and the creditor justifiably relied on the representation, in addition to the fact the creditor sustained a loss. According to Nebraska Furniture Mart, the representation that was made by the debtor was that he intended to and had the ability to pay for the purchases at the time the purchases were made but that representation was false, and the debtor knew it was false in that the debtor must have known he could not make the payments, and that he made such representation deliberately and intentionally with an intent and purpose of deceiving Nebraska Furniture Mart into delivering him goods on credit.

I find, based upon the facts as described above, that the Nebraska Furniture Mart has failed to meet its burden. Although Mr. Miller, in early 2002, realized his business cash flow was not the same as it had been in prior years, there is no evidence that he realized both of his businesses would get so bad that he would be unable to make the payments on the debt incurred with Nebraska Furniture Mart. Similarly, even though the purchases made in 2003 were just a few months prior to the bankruptcy filing, there is no evidence that he knew or should have known that he would be unable to pay for the carpet and the projector purchased in the spring and summer of 2003. The real estate business was at the break-even point and continued in operation for a significant time after the purchases were made and the bankruptcy was filed. There is no evidence

that, either in 2002 or at the time the purchases were made in 2003, Mr. Miller had consulted with an attorney concerning filing bankruptcy.  I cannot conclude from the evidence presented that Mr. Miller received the products purchased from the Nebraska Furniture Mart on the basis of making a false representation, false pretenses or actual fraud.  Therefore, judgment will be entered in favor of Mr. Miller and against the Nebraska Furniture Mart and the debts owed by Mr. Miller to Nebraska Furniture Mart shall be discharged.

DATED:     March 7, 2008

BY THE COURT:

/s/ Timothy J. Mahoney
Chief Judge

Notice given by the Court to:
*Sara Miller
Jeffrey L. Miller
U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.